J. E. SAFFORD *vs.* THE GAYSVILLE MANUFACTURING COMPANY and THE BETHEL ELECTRIC LIGHT & POWER COMPANY.

May Term, 1898.

Present: ROSS, C. J., TAFT, ROWELL, MUNSON, START and THOMPSON, JJ.

Opinion filed October 12, 1898.

*Reservation or Restriction?*—A clause in a deed, although there named a reservation, must be given its natural force, even if it operate as a restriction upon the rights of the grantor.

*Reservation or Restriction?*—There were three equal water-rights upon White River at Gaysville, one upon the west side, called the Gay right, the other two upon the east side, called respectively the mill right and the factory right. In 1889 the mill right and the factory right were both owned by the Manufacturing Co., which then sold to Adams the mill, yard and machinery, "and the right of drawing two-ninths of the water of said river when and so long as the water of said river runs over the dam;" but provided that the grantee, his heirs and assigns, were "not to draw any water from the pond, except when it is running over the dam;" although if the grantor or its assigns should not want to use the water, the grantee, his heirs and assigns, "may take, draw and use such water," subject to the Gay right, "until the grantor or its assigns shall want to use the same." Then the grantor reserved "all its rights of taking, drawing and using the water in said dam in the way and manner it has been accustomed to take and use the same, except that the grantee, his heirs and assigns, shall have the right to draw water as aforesaid." In view of the situation, history and circumstances, which are too voluminous to be brought within the proper limits of a head-note, it was *held*, that the so-called reservation operated to restrict the grantor's right in the use of the water to the

length of time, identity of hours and quantity used, that it had been accustomed to run and use, but not to the identical hydraulic conditions, if these could be changed without detriment to the grantee.

*Costs.*—Both parties appealed; but the defendants having secured a reversal are allowed their costs in this court.

CHANCERY. Heard on pleadings, master's report, exceptions thereto and motion to recommit, Windsor county, before *Tyler*, Chancellor, who on February 14, 1898, rendered a decree perpetually enjoining the defendants from altering the bulkhead or flume under the sawmill and grist-mill, or the rock raceway, and from taking water in any other way than that in which said Manufacturing Co. has been accustomed to take it, and from drawing from the pond earlier than six o'clock in the morning or later than half-past six o'clock in the afternoon. Both parties appealed.

*William E. Johnson* for the orator.

*Hunton & Stickney*, for the defendant, cited on the question of construction, *Rood* v. *Johnson*, 26 Vt. 64; *Rogers* v. *Bancroft*, 26 Vt. 257; *Adams* v. *Warner*, 23 Vt. 410; Gould on Waters, § 318, note 4.

ROWELL, J. There has been a water-power in Gaysville ever since 1825 formed by a dam across White River. In 1845 this power was divided into thirds, namely, the Gay right on the west side of the river, the grist-mill and sawmill right on the east side of the river, and the factory right on the same side, below the grist-mill and sawmill right. From 1845 to 1856 these rights were owned separately; but in 1856, Thomas Greenbank, the then owner of the factory right, bought the mill right, and thereafter continued to own and use both rights till 1873, when he sold and conveyed them to Tupper, Gay, Brooks and Baxter, and in 1888 they sold and conveyed them to The Gaysville Manufacturing Company, a corporation by voluntary association. At this time there was a large woolen factory on the factory right, built by Greenbank, and the

Manufacturing Co. ran it till October, 1888, when it was burned and has not been rebuilt.

In April, 1889, the Manufacturing Co. sold and conveyed the sawmill and grist-mill and millyard to John Q. Adams, together with all the machinery used in connection therewith, "and the right of drawing two-ninths of the water of said river when and so long as the water of said river runs over the dam;" but the grantee, his heirs and assigns, were "not to draw any water from the pond, except when it is running over the dam;" but if the grantor or its assigns should not want to use the water, then and in that case the grantee, his heirs and assigns, "may take, draw, and use such water," subject to the Gay right, "until the grantor or its assigns shall want to use the same." The deed was conditioned that the grantee, his heirs and assigns, should bear two-ninths of the expense of building and maintaining the dam, and the whole expense of keeping the flume under the mills in repair, except at such times as the grantor or its assigns should use and occupy its share of the water-power, when the grantor should bear two-thirds of that expense. The grantor reserved "all its rights of taking, drawing, and using the water in said dam in the way and manner it has been accustomed to take and use the same, except that the grantee, his heirs and assigns, shall have the right to draw water as aforesaid."

Adams owned and operated his mills till October, 1891, when he sold and conveyed to the orator all that he acquired of the Manufacturing Co.

The Bethel Electric Light & Power Company was incorporated July 30, 1895, and soon bought of the Manufacturing Co. all and singular its remaining water rights and privileges, including the factory site, whereon it has built an electric plant, and is furnishing lights to the village and people of Bethel, taking water from said dam for its power.

The only question submitted is, what water rights were

conveyed by the deed from the Manufacturing Co. to Adams?

From 1856 to the time the factory was burned in 1888, most of the water used on the east side of the river was by the factory, which did the principal part of the business during that time, the mills doing comparatively little business; and when the water was scarce, so that it was inconvenient for the factory to have the mills running, the gates of the latter were shut down, the factory being the principal interest. For two or three years before Adams bought, the mill building was used by the Manufacturing Co. for storage purposes.

While Greenbank owned the factory, there were two water-wheels in the grist-mill and sawmill. The water was taken from the pond through an opening in a bulkhead at the east end of the dam into a forebay that extended across the south end of the sawmill, and from this forebay the water was taken to the factory wheel in an open plank sluice running under the mill to a rock raceway extending under a highway at the north end of the mill. This raceway is covered with earth and stone, and the bottom is three feet and nine inches lower than the top of the dam, and three feet higher than the bottom of the head-gate through which the water flows from the forebay to the flume under the orator's mill. It remains as originally constructed more than fifty years ago, and the top of it is so much higher than the top of the dam that it never fills except in extremely high water. The only way that water was ever taken to the factory is through this raceway, from the north end of which,. water ran to the factory wheel in an open plank flume. The water was taken to the two wheels under the grist-mill and sawmill in separate spouts or sluices running from the bottom of the forebay to the wheels, whereby full head was given.

In 1879, after Greenbank sold out, the factory wheel not giving the desired power, substantial changes were made in

the manner of taking water to the wheels under the sawmill and grist-mill and the factory. The plank sluices under the mills were taken out, and the entire space between the forebay and the rock raceway, thirty feet wide and seventy feet long, was used as a flume, the overflow of which runs into the river over the sill of the mill, which is on a level with the top of the dam. From this flume the water runs through the rock raceway, and was taken thence in a circular penstock to the factory wheel, which was a four-foot, sixty-horse-power Hathaway wheel, substituted in place of the wheel used by Greenbank. No wheel of greater power than this, nor that took more water, was ever in the factory, and this was sold to Adams after the factory was burned, and he put it into his mill in place of one of his wheels. The plant was much out of repair when he bought it, and he at once commenced to repair it, and expended about a thousand dollars therein and in putting in new machinery. Amongst other things he repaired the dam and put a new gate into the forebay that admitted more water than the old gate did, and the other owners contributed to this last-mentioned expense. He bought the property to use as a saw and grist-mill to be operated by water, and would not have bought it but for the water-power, and the mill buildings were at that time of no value to him aside from the water-power. The Manufacturing Co. understood Adams's purpose in buying, and sold the property to him to be used as a saw and grist-mill to be operated by water, and it did not at that time contemplate the use of its own power for electrical purposes.

The orator, after his purchase, laid out about $1,500 on the property, and ran the mills till they burned in February, 1895, after which he rebuilt at an expense of about $13,000.

Usually both the Gay factory and the Greenbank factory ran from 6:30 A. M. to 6:30 P. M.; and occasionally a part of the machinery was run after 6.30 P. M. to not later than

10 P. M., for the purpose of evening up some part of the work that had got behind other parts.

When the water was running over the dam, there was no difficulty in running the wheels in the mills and factories on all the rights with sufficient power to operate the machinery. The river does not furnish a constant supply of water. It varies greatly at different seasons, and at different times in the same season, and at times of low water the quantity is very limited. At times every year there is not enough to furnish the power required for the orator's wheels and the Gay right.

The Electric Co.'s plant was put in to furnish both light and power, and to run day and night, and it intends to run it so, though as yet it has run it only for lights. If it runs day and night, the master finds that the orator could never have any use of the water without cutting off the supply of the Company's wheel, which is of much greater power than the Hathaway wheel that was in the factory when it was burned, and draws much more water. The orator has also changed his wheels and put in a third, and can draw much more water than Adams could when he bought.

The Electric Co. claims the right to lower the rock raceway so it can draw water from the bottom of the pond. The master finds that if it does, the head would be increased and also the flow of water through the raceway, and that the Company's wheel would so exhaust the water every night that there would not be enough to fill the pond so as to run over the dam before the Company would begin to use water the next night, and that thus the orator would, in a dry time, have no opportunity to use the water, as it would never be high enough to run over the dam. As the raceway now is and the Company's works now are, it cannot draw the water more than a foot below the top of the dam.

As to the construction of the deed in question, the orator claims that thereby the grantor undertook to convey all the

water in the river, except the Gay right, when it did not want to use any, and two-ninths of the water in the river when it runs over the dam, the grantor using the water as it had been accustomed to use it; that the Electric Co. can use it as the Manufacturing Co. was accustomed to use it, and that whenever, with that use, there is sufficient water to run over the dam, the orator has a right to use two-ninths of the water of the river.

The defendants claim, on the other hand, that whether the language of the deed is considered alone or in connection with the facts and circumstances touching the use of the water and the situation and condition of the parties, but one conclusion can be drawn as to what was intended to be conveyed, and that is, two-ninths of the water of the river when it runs over the dam, the grantor reserving to itself all its rights in the real estate conveyed that were necessary to an efficient use of the water rights it did not grant away; that it intended to retain all that was excepted from the grant and all that it owned besides, and intended to be a tenant in common with the grantee when the water runs over the dam; that it is the exclusive owner of two-thirds of the water in the pond when the water does not run over the dam, and did not intend its grantee should be a tenant in common with it at all times, but intended to convey a lesser right, and one subordinate to its own; that the conveyance of the sawmill and grist-mill conveyed the flume under them, which the grantor had been accustomed to use; and not wishing nor intending to be restricted in that use as long as it was advantageous to continue it, it reserved that right by the reservation clause, which was intended to operate as an exception from the conveyance and not to effect what was not conveyed.

We are inclined to the orator's view, largely. The deed conveys the absolute right to draw two-ninths of the water of the river when, and only when, the water runs over the dam, and expressly negatives all right to draw any water

from the pond when the water does not run over the dam, except that it gives the grantee, his heirs and assigns, unrestricted authority to draw water, subject to the Gay right, whether it runs over the dam or not, when the grantor or its assigns do not wish to draw it.    As to the reservation clause, it makes but little difference whether it is strictly such or not, for its language must be given its proper force and meaning, whatever it is.    It reserves "all the grantor's rights of taking, drawing, and using the water in said dam in the way and manner it has been accustomed to take and use the same, except that the grantee, his heirs and assigns, shall have the right to draw the water as aforesaid."    This clearly restricts the grantor in its use of the water to the way and manner it had been accustomed to use it.    This construction accords with the intention of the parties, for Adams bought the property for the purpose of using it as a saw and grist-mill to be operated by water power, and would not have bought it but for that power, and the mill buildings were then of no value to him without the power; and the Manufacturing Co. understood his purpose in buying, and sold the property to him to be used and operated accordingly.    But the other construction would practically defeat their intention, for thereby Adams's right to water would be entirely dependent on the will of the grantor, which would be at liberty so to use and exhaust the water that he could have none, except in high water, without cutting off the grantor's supply; and this the master finds would be the result if the Electric Co. should run day and night as it intends to do.    In view of the language and the subject-matter of the deed and the accompanying circumstances, we think such a construction of the deed would be unwarrantable.

As to the scope of said restriction, we think that when there is not water enough for both parties, the Gay right being respected, it confines the Electric Co. in the use of water to the length of time, identity of hours, and quantity

used, that the Manufacturing Co. was accustomed to run and use, as shown by the report; but we think it does not extend to the hydraulic conditions existing at the time said deed was given, so as to make them unchangeable, but if any change can be made in those conditions that will be beneficial to the Electric Co. and not detrimental to the orator, the Company is at liberty to make them. The parties do not agree whether such changes can be made; but concerning that, let further inquiry be had if desired.

Let the question of costs below be there determined; but let the defendants recover costs in this court, for although both parties appealed, the defendants have secured a reversal.

*Decree reversed and cause remanded, with mandate.*